OPINION OF THE COURT
Walter M. Schackman, J.
Defendant Andrew Warwick Dixon, representative underwriter on behalf of all interested underwriters at Lloyds subscribing to policy of insurance No. SCB200578/92 (the Underwriters), moves for an order of summary judgment to dismiss the complaint on the grounds that the insurance policy was voided, ab initio, when plaintiff made material misrepresentations in its application or proposal for insurance pursuant to Insurance Law § 3105 (a). Dixon also maintains that plaintiff breached the contract of insurance by failing to comply *452 with policy conditions which required it to maintain proper accounting books and records.
Plaintiffs Falcon Crest Diamonds, Inc., Falcon Crest Gem Corp. and Raymond Nassimi oppose the motion and cross-move to dismiss defendant’s first affirmative defense of breach of the warranties, conditions and representations contained in the proposal for insurance and the fifth affirmative defense that the loss occurred during an illegal transportation or trade in merchandise.
I
FACTS
This is an action for breach of insurance contract and defamation.[1]
Plaintiff Nassimi has been a diamond dealer for 12 years. He originally worked in Venezuela and then relocated to New York where he traded under the name "Raymond Nassimi”. In 1989, Nassimi organized Falcon Crest Gem Corp. as a New York corporation. This entity ceased trading and was allegedly dissolved by the New York Secretary of State in May of 1992 for failure to pay corporate taxes. On May 14, 1992, Nassimi incorporated a new business known as Falcon Crest Diamonds, Inc. (Falcon Crest) which is presently involved in the wholesale business of purchasing and selling diamonds and precious gems. Nassimi is the president, sole principal and sole shareholder of the plaintiff corporation.
In March 1992, Nassimi sought the services of an insurance broker, Gerard Adams of Gueits, Adams & Co. (Gueits) and requested him to act as his agent in obtaining an all-risk jewelers block policy of insurance (Jewelers Block Policy). A Jewelers Block Policy is designed to insure various types of losses relating to the merchandising of jewelry, diamonds and precious stones, including the theft of merchandise while an insured is traveling on business. According to the Underwriters, in order to obtain a Jewelers Block Policy, an insured must first supply information to the insurer regarding its business practices, inventories and maintenance of books and records. In addition, the insured must supply information concerning the other related diamond entities involved with the prospective insured, and the risks the insured takes while travelling with its merchandise.
*453 Adams avers that he met with Nassimi on March 27, 1992[2] to discuss coverage as well as to ascertain the risk and to set a premium. At that time, Nassimi allegedly revealed that he takes diamonds into Venezuela without making a declaration to customs in order to avoid paying the 80% duty. Nassimi did not state that he would be actually carrying $1,000,000 in merchandise.
Adams avers that he told Nassimi that the information provided would be submitted to the Underwriters as part of the application process and that the proposal information would be the basis upon which a policy of insurance would be issued. The broker also expressed concern over the fact that Nassimi did not declare the diamonds on entry into Venezuela and informed him that such an omission would make it more difficult to notify the policy of a loss and that failure to notify the authorities would impact the ability to pay a claim.
Based on the information stated, Adams informed Nassimi that his premium was estimated to be $16,000. At that time Nassimi did not place insurance; however, he contacted Adams later and the two men met again on May 22, 1992 to prepare a proposal for the Underwriters.
Adams’ final draft of the proposal stated that the insured was requesting $250,000 on stock coverage during the hours that the premises would be open for business, storage for safe-deposit vaults and for location outside the premises of the proposal. In addition, the proposal requested $50,000 coverage for diamonds entrusted to other dealers and stated that the worth of diamonds taken to Venezuela would average $150,000 and that the maximum value would be $250,000. The proposal also stated that Falcon Crest kept stock records and took physical inventory annually and that burglar alarms would be installed. This document also provides that "[signing this proposal and declaration does not bind the Proposer to complete the insurance but it is agreed that this proposal and declaration shall constitute a warranty should it be issued”. The proposal was not signed by Nassimi.
Falcon Crest requested Adams to expedite the placing of the insurance coverage due to the fact that Nassimi was travelling to Venezuela for an extended business trip. On May 22, 1992, Adams telexed the proposal information to his London agent, *454 Downes & Burke, who would actually place the insurance with the Underwriters. The telex stated that the inventory amount of goods was $1,000,000 and that the exposure dollars was $200,000. Moreover, the telex represented that travel figures for "In Town” were $75,000/250,000 for 100 days and that the "Out of Town” figure was $150,000/250,000 for 30 days. There was a separate listing for Venezuela of $150,000/250,000 for 30 days. The deductible was $2,500. Nassimi reported one prior armed robbery at $250,000 which was not insured. Adams avers that it was the practice to bind coverage with the insurer first with the understanding that formal cover notes along with a signed and dated proposal would shortly follow.
On May 27, 1992, Adams received confirmation from London that the Underwriters received the telex and that coverage became effective on that day. Adams supplied Falcon Crest with insurance documents that confirmed that the Underwriters accepted coverage. On June 3, 1992, Adams forwarded a document entitled "Confirmation of Insurance” which stated that the coverage commenced on May 27, 1992 and expired on May 27, 1993. This Confirmation of Insurance also contained all coverage information as well as all policy conditions and warranties. A few days later on June 16th, Adams forwarded additional insurance documents, premium financing documents and the typed "Proposal for Insurance” to Falcon Crest for signature and subsequent return to Gueits. There is no evidence that Nassimi ever returned a signed copy to Gueits.
The terms of the policy specifically excluded "seizure or destruction under quarantine or Customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade” (see, policy H 4 [c] [3]). A policy endorsement also provided that the paper work concerning the physical inventory stated in the proposal form dated May 27, 1992 would be available to the Underwriters in the event of loss.
Nassimi left for Venezuela on May 31, 1992. On June 18, 1992, Nassimi advised his broker that he had been robbed in Caracas, Venezuela, while travelling with his entire inventory of $1,719,000 worth of gems and diamonds most of which were allegedly on consignment to him from various wholesale diamond dealers in New York City. Nassimi alleges that he carried the merchandise in a Duane Reade shopping bag and was accosted by six unknown perpetrators while walking in downtown Caracas during the lunch hour. The robbers took his merchandise and sped off on two motorcycles (three robbers on each motorcycle).
*455 Defendant Nassimi admits that he made 10 to 15 trips to Venezuela and that he usually takes around a million dollars worth of gems. Nassimi also represents that he entered Venezuela with one of the two Venezuelan passports issued to him explaining that he alternates using each passport so that Venezuelan and United States Customs do not get suspicious regarding the number of entry and exit stamps in each passport. Furthermore, Nassimi admits he did not declare to Venezuelan Customs that he was carrying approximately $1.7 million worth of commercial goods, in order to avoid the import duty.
II
DISCUSSION
In order to obtain summary judgment, the movant must establish its claim sufficiently to warrant the court to direct judgment in its favor (Zuckerman v City of New York, 49 NY2d 557, 562). The party opposing a motion for summary judgment must produce evidentiary proof in admissible form which is sufficient to require a trial of material questions of fact (supra). Mere expressions of hope or unsubstantiated allegations and assertions are insufficient (supra).
Dixon contends that the insurance policy was void, ab initio, due to the fact that Nassimi made various misrepresentations to the insurer which affected the decision to issue a Jewelers Block Policy. For example, defendant notes that Nassimi routinely travelled to Venezuela carrying in excess of the $250,000 maximum amount of goods stated in the proposal. Falcon Crest failed to take and retain annual inventories, as well as failed to maintain a stock book as represented in the proposal. In addition, Nassimi did not disclose that Falcon Crest would not pay customs duty on the gems and diamonds. Defendant also maintains that Falcon Crest’s poor record-keeping practices breached the contract of insurance.
In response, plaintiffs contend that since Nassimi did not sign the proposal prepared by Adams they are not bound by the alleged representations made in that document. Plaintiffs also maintain that defendant could not have relied on Falcon Crest’s record-keeping practices as the telex did not contain any information concerning such information. Moreover, plaintiffs also contend that defendant is precluded from raising a misrepresentation defense pursuant to the doctrines of waiver and estoppel. Plaintiffs state that the Underwriters *456 were aware that Nassimi did not sign the proposal and failed either to object to this omission or to inquire further into Falcon Crest’s business dealings. Instead, the Underwriters chose to continue the coverage in full force and effect.
This court rejects plaintiffs’ assertion that they are not responsible for the terms in the proposal since Nassimi did not sign this document. Generally, in New York, "oral contracts for insurance are valid as long as all of the elements essential for such a contract are satisfied” (Bulger v Tri-Town Agency, 148 AD2d 44, 46, lv dismissed 75 NY2d 808). In this instance neither side disputes that the Underwriters issued a policy.
Furthermore, plaintiffs’ assertion that a signed written statement is necessary in order to bind the insured would be valid if the instant policy was either a group or a blanket accident and health insurance policy pursuant to Insurance Law § 3221 (a) (1) (A) (see, New York Life Ins. Co. v Palmer, 169 AD2d 823). However, the provisions of section 3221 (a) (1) (A) are not applicable to the Jewelers Block Policy.
In this instance, the Jewelers Block Policy may be avoided if the insured made a material misrepresentation (Insurance Law § 3105 [b]). A "representation” is defined as "a statement as to past or present fact, made to the insurer by, or by the authority of, the applicant for insurance or the prospective insured, at or before the making of the insurance contract as an inducement to the making thereof’ (Insurance Law § 3105 [a]). Hence, under New York law a party may make a material representation through a broker. The absence of Nassimi’s signature on the proposal or the telex, however, is not dispositive in this instance since plaintiffs do not deny that Adams had the authority to act for them. Furthermore, plaintiffs have not raised any issue of fraud on behalf of the broker. Plaintiffs do not deny that they made those specific representations to Adams nor do they dispute the terms sent in the telex.
Accordingly, the court finds that since Adams was plaintiffs’ agent for the purpose of securing coverage, his representations were binding on plaintiffs (Amalgamated Mut. Cas. Co. v Schultz, 27 Misc 2d 208, 210; Insurance Law § 3105 [b]).
"To demonstrate materiality as a matter of law, an insurer need only show that the misrepresentation ' "substantially thwarts the purpose for which the information is demanded and induces action which the insurance company might otherwise not have taken” ’ ” (Aguilar v United States Life Ins. Co., 162 AD2d 209, 210-211 [emphasis in original], quoting Geer v Union Mut. Life Ins. Co., 273 NY 261, 271, rearg *457 denied 274 NY 569). The question in each case is whether the company had been induced to accept an application which it might otherwise have refused (Aguilar v United States Life Ins. Co., supra; Geer v Union Mut. Life Ins. Co., supra, at 269). Whether the insured understood the significance of the misrepresentation at the time of contract is irrelevant to the determination of the issue of materiality (Leamy v Berkshire Life Ins. Co., 39 NY2d 271, 274). In this way, even an "innocently” made factual misrepresentation may serve to avoid an insurance contract if the insurer would have refused to issue a policy if it knew the true circumstances of the insured (Tennenbaum v Insurance Corp. of Ireland, 179 AD2d 589, 592 [cancellation of insurance contract valid even though the claim on the insured’s application that building was in good condition was an innocent mistake]).
It is axiomatic that the value of the item to be insured is material to the question of whether an insurer will issue a policy and the premium charged for that coverage (see, Designcraft Jewel Indus. v St. Paul Fire & Mar. Ins. Co., 59 AD2d 857, 858, affd 46 NY2d 796, rearg denied 46 NY2d 1076).
Furthermore, proof of an insurer’s underwriting practices with respect to applicants with similar histories is also required (Alaz Sportswear v Public Serv. Mut. Ins. Co., 195 AD2d 357, 358). Relevant documentation includes insurance company underwriting manuals, rules or bulletins which pertain to insuring similar risks (Shapiro v Allstate Life Ins. Co., 202 AD2d 659, 660; Insurance Law § 3105 [c]). "When the undisputed evidence establishes the practice of the insurer to refuse as a standard risk what it has accepted because of misrepresentation, it has the absolute right to rescind the policy” (Greene v United Mut. Life Ins. Co., 38 Misc 2d 728, 732, affd 23 AD2d 720, lv denied 16 NY2d 482, rearg denied 16 NY2d 992).
In support of the particular requirements of the Jewelers Block Policy, defendant submits the affidavit of Rogan C. Dwyer, the underwriter for R.C. Dwyer & Others, Syndicate 323, an insurance syndicate that transacted insurance business at Lloyds, London, England. Dwyer avers that proposals for insurance are typewritten applications prepared by the assured’s insurance broker who related the necessary information to an Underwriter at Lloyds. He represents that "the inquiries made in the Proposal are for information relating to the assured’s amount of inventory, record keeping methods, prior losses, security measures and amount of inventory carried outside the *458 assured’s premises or sent through postal or shipping services” (Dwyer affidavit, dated Aug. 17, 1995, ¶ 6). Although each individual broker is permitted to use his own letterhead, all Jewelers Block Proposals are similar. The questions asked are based upon years of the inquiries made by Lloyds Underwriters to prospective assured and are related to similar concerns about the risks undertaken by jewelry and diamond merchants. The areas of inquiry are designed to elicit the nature and degree of the risk as well as to help establish a premium.
Accordingly, defendant has established that the information requested in the proposals is material to the Underwriters’ determination to issue a policy.
As to the obligations of the insured to disclose, Nassimi had a duty to exercise good faith and to answer questions honestly (Chase v William Penn Life Ins. Co., 159 AD2d 965, affd 76 NY2d 999, rearg denied 77 NY2d 874, rearg dismissed 77 NY2d 990, cert denied 502 US 812; Insurance Law § 3105 [b]). In determining whether or not plaintiffs had improperly failed to disclose a particular fact, the court is required to employ an objective standard, i.e., whether "a reasonable person in the insured’s position would know that the particular fact is material” (Alaz Sportswear v Public Serv. Mut. Ins. Co., 195 AD2d, at 358, supra), or something which would have controlled Underwriters’ decision to accept the risk.
In this instance, Nassimi readily admits that he customarily travelled with more than $250,000 in gems and that he usually carries closer to $1,000,000. Clearly as an experienced diamond merchant, Nassimi should have known that he was required to give the actual value of the gems and that he was underestimating the true value of the stones in the proposal. Despite the fact that answers given to inquiries are to be construed with "the greatest liberality in favor of the insured” (Chase v William Penn Life Ins. Co., 159 AD2d, at 966, supra), a discrepancy of over $1,000,000 between what Nassimi stated in the proposal as value of the merchandise taken to Venezuela and the actual worth of the diamonds stolen is more than a mere technical failure or an immaterial omission (see, generally, Raymond v Allstate Ins. Co., 94 AD2d 301, 304). There is also no evidence that Nassimi tried to rectify the situation by obtaining more insurance or that he ever notified the defendant prior to his departure to Venezuela that he would be travelling with stones of a substantially greater worth.
Furthermore, the court finds that the wording of the questions in the instant proposal was clear enough for an experi *459 enced merchant to understand and there was no confusion as to what information the Underwriters required (cf., Chang v General Ace. Ins. Co., 193 AD2d 521 [issue of fact raised as to whether the perceived concealment and misrepresentation were the result of ambiguity in the insurer’s questions and the plaintiffs difficulty with the English language]).
This court also finds that plaintiffs’ argument that the Underwriters are barred by the doctrines of waiver and estoppel from raising the defense of misrepresentation is without merit. Cross movants have not presented any proof that the insurer voluntarily and intentionally relinquished a known right (Schiff Assocs. v Flack, 51 NY2d 692). Moreover, plaintiffs may not claim prejudice on the grounds that the insurer failed to discover at the proposal stage that Nassimi carried much more than the stated value of the stones on business trips (see, Modern Holding Co. v Ridgewood Sav. Bank, 210 AD2d 465). Contrary to plaintiffs’ assertion, the Underwriters’ right to void the policy has not been compromised by its approval of the unsigned proposal (see, Greene v United Mut. Life Ins. Co., 38 Misc 2d, at 730, supra). Since there was no evidence at the time when Adams prepared the proposal that Nassimi’s representations were incorrect, the Underwriters had no reason to make further inquiry (supra). Acceptance of the proposal was with the understanding that the insurer intended to rely upon the truth of the applicants’ statements to their broker (supra).
Accordingly, this court finds that the net effect of Nassimi’s nondisclosures and misleading disclosures was to deprive the Underwriters of " 'freedom of choice in determining whether to accept or reject the risk’ ” (Leamy v Berkshire Life Ins. Co., 39 NY2d, at 274, supra). Therefore, that branch of defendant’s motion for summary judgment to dismiss the complaint on the grounds that the insurance policy was voided, ab initio, for misrepresentation is granted for the reasons stated herein and the complaint is hereby dismissed. In turn, that branch of plaintiffs’ cross motion to dismiss the first affirmative defense of breach of the warranties, conditions and representations contained in the proposal for insurance is denied.
The court need not reach the remainder of defendant’s objections to the coverage on breach of contract grounds and these issues are dismissed as moot. In turn, the remainder of plaintiffs’ cross motion is also denied.

. No arguments have been addressed to the defamation claims in this application.

. Plaintiffs maintain that Nassimi first meet Adams in May and that defendant’s representation that the two men first meet in March is a typographical error.